**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:21-CR-342 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| JAQUAN MARQUI BRABHAM | : | |
| | : | Judge Jennifer P. Wilson |

## MEMORANDUM

Defendant Jaquan Marqui Brabham ("Brabham") is charged in a two-count indictment with one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1), and one count of possession of a firearm with an altered or obliterated serial number, in violation of 18 U.S.C. § 922(k). (Doc. 1) Brabham moves to dismiss count two under *New York State Rifle & Piston Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), arguing that Section 922(k) violates the Second Amendment to the United States Constitution. (Doc. 50.) Section 922(k) provides:

> It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered or to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(k).

For the reasons that follow, the court will deny the motion to dismiss the indictment because the conduct regulated by § 922(k) is not covered by the plain text of the Second Amendment, and alternatively, the Government has met its burden of providing historical regulations analogous to the instant statute.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

As found by this court in its prior opinion regarding Brabham's suppression motion, Brabham was stopped on Interstate 83 in York County at around 2:30 a.m. on August 8, 2020.  (Doc. 108, p. 4.)[1]  Upon approaching Brabham's vehicle, Pennsylvania State Police Trooper David Owens ("Trooper Owens") detected a faint, yet unmistakable, odor of marijuana.  (*Id.*)  At this time, Brabham handed Trooper Owens a Pennsylvania identification card.  Upon checking this information, Trooper Owens learned that Brabham had a suspended license.  (*Id.*)

Upon returning to the vehicle, Trooper Owens again smelled an odor of marijuana that was stronger than on his initial approach.  (*Id.*)  When Trooper Owens asked Brabham about the smell of marijuana, Brabham stated that he did not have any marijuana.  (*Id.* at 5.)  Trooper Owens asked Brabham to exit the car and Brabham complied.  Trooper Owens informed Brabham that he was going to search the care because "it smelled like weed."  (*Id.*)  Brabham told Trooper Owens that he had a medical marijuana card, but did not have it on him, though he

---

[1] For ease of reference, the court utilizes the page numbers contained in the CM/ECF header.

did have his "registration" on his phone. (*Id.*) Brabham then showed Trooper Owens something on his phone, which Trooper Owens testified appeared to be an application for a medical marijuana card. (*Id.*)

Trooper Owens then informed Brabham that he was going to search the vehicle and found a black bag that was in the front passenger seat. (*Id.*) Inside the bag, there was a pack of THC gummies and loose-leaf marijuana. (*Id.*) There was a digital scale in the center console. (*Id.*) At this time, Trooper Owens attempted to search the glove box, but it was locked. (*Id.* at 6.) Trooper Owens returned to Brabham and asked for the key, and Brabham handed him a key that did not open the glovebox. (*Id.*) Trooper Owens returned and relayed this to Brabham, but Brabham was adamant that was the correct key. When confronted with the information that it did not open the glove box, Brabham stated the correct key must have fallen off the keychain. (*Id.*)

Trooper Owens then resumed his search of the car. Standing at the open passenger side door, Trooper Owens could see down into the glove box through an air vent opening which was missing the plastic covering grate. (*Id.*) Through this opening, Trooper Owens saw a clear plastic bag containing what Trooper Owens, in his experience, identified as marijuana. (*Id.*) Trooper Owens then asked Brabham when he had last smoked marijuana, and Brabham related he last smoked around 3:00 p.m. the prior day. (*Id.*) Trooper Owens administered standardized

3

field sobriety tests and determined that Brabham was not impaired.  (*Id.*)  After administering the standardized field sobriety tests, Trooper Owens placed Brabham under arrest for possessing a small amount of marijuana.  (*Id.*)  After placing Brabham under arrest, Trooper Owens again returned to the car to search the air vent opening into the glove box.  (*Id.*)  Trooper Owens observed "a good bit of plastic" that he pulled out of the air vent.  (*Id.*)  Once he pulled the plastic out, he found two more bags of THC gummies, a metal grinder, and a firearm.  (*Id.* at 6, 7.)  As charged in the indictment, the firearm found in the vehicle was a Sig Sauer P229 pistol that had the manufacturer's serial number removed, altered, or obliterated.  (Doc. 1, p. 2.)

Brabham was charged by indictment on November 3, 2021, with one count of possession of a firearm by a prohibited person and one count of possession of a firearm with an altered or obliterated serial number.  (Doc. 1.)  On December 30, 2022, Brabham filed a motion to suppress evidence and brief in support,[2] a motion to suppress statements and brief in support,[3] the instant motion to dismiss count 2 and a brief in support, and a motion to dismiss the indictment as unconstitutional in violation of the Fifth Amendment.[4]  (Docs. 46, 48, 50, 52.)  Brabham filed a brief

---

[2] This motion was denied after a hearing on March 1, 2024.  (Docs. 108, 109.)

[3] This motion was granted after the Government notified the court it did not intend to introduce, nor did it possess, any evidence of custodial statements.  (Doc. 64.)

[4] This motion was denied on March 1, 2024.  (Docs. 108, 109.)

in support of his motion to dismiss count 2 on the same day, December 30, 2022. (Doc. 51.)  The Government filed a brief in opposition on January 30, 2023.  (Doc. 66.)  Brabham filed a reply brief that addressed all of the above motions on February 13, 2023.  (Doc. 71.)

On June 27, 2023, Brabham filed another motion to dismiss the indictment based on *New York State Rifle & Pistol Ass'n Inc. v. Bruen*, 597 U.S. 1 (2022) and *Range v. Att'y General, United States of America,* 69 F.4th 96 (3d Cir. 2023). (Doc. 94.)  In response to this motion, the Government addressed both the § 922(g)(1) and § 922 (k) charge.  (Doc. 102.)  In his reply, Brabham addressed the § 922(k) arguments again.  (Doc. 103.)  Accordingly, the court will consider the arguments contained in the briefing on two motions to dismiss in its disposition of the instant motion to dismiss count 2, namely Docs. 51, 66, 71, 94, 102, and 103.

## DISCUSSION

### A. The Text of the Second Amendment and Significant Rulings on the Second Amendment

The text of the Second Amendment states: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.

From 1939 to 2008, the Second Amendment was interpreted in accordance with *United States v. Miller*, 307 U.S. 174 (1939).  In *Miller*, the Supreme Court focused on the history and meaning of the word "Militia" in the context of the

Second Amendment.  The Court observed that the Constitution, as originally adopted, granted Congress the power "'To provide for calling forth the Militia to execute the Laws of the Union.'"  *Miller*, 307 U.S. at 178 (quoting U.S. Const. art. 1, § 8).  The Court then held: "With obvious purpose to assure the continuation and render possible the effectiveness of such forces the declaration and guarantee of the Second Amendment were made. It must be interpreted and applied with that end in view."  *Id*.  This Militia-based rationale for the Second Amendment held sway for 70 years.  *See United States v. Bullock*, No. 3:18-CR-165, 2023 WL 4232309, at *6 (S.D. Miss. June 28, 2023) (discussing scholarly articles regarding *Miller*).

Then, in 2008 and 2010, the Supreme Court decided *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. Chicago*, 561 U.S. 742 (2010), resulting in a significant change in our understanding of the Second Amendment. In those decisions, the Court "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."  *Bruen*, 597 U.S. at 8, 9. (citing *Heller*, 554 U.S. at 570; *McDonald*, 561 U.S. at 742).  And then, in 2022, the Court held in *Bruen* "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."  *Id*. at 10.  Following the holdings of *Heller*, *McDonald*, and *Bruen*, the Nation now understands that the

Second Amendment establishes an individual right to keep and bear arms that does not depend on service in the militia.

In the years following *Heller* and *McDonald*, "the Courts of Appeals . . . coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Id.* at 17.  In *Bruen*, the Court rejected the two-step framework that had developed, and detailed the correct standard to be applied to Second Amendment challenges.  *Id.* at 17–31. The Court explained that the correct standard is as follows:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)). The Court provided some guidance as to how courts are to assess whether a modern firearm regulation is consistent with historical tradition.  The Court observed first that when analyzing a modern firearm regulation that addresses a "general societal problem that has persisted since the 18th century":

> [T]he lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.  Likewise, if earlier generations addressed the societal problem, but did so through

> materially different means, that also could be evidence that a modern
> regulation is unconstitutional.   And if some jurisdictions actually
> attempted to enact analogous regulations during this timeframe, but
> those proposals were rejected on constitutional grounds, that rejection
> surely would provide some probative evidence of unconstitutionality.

*Id.* at 26, 27.  On the other hand, when analyzing a modern firearm regulation that

was "unimaginable" during the founding era, the Court instructs:

> [T]his historical inquiry that courts must conduct will often involve
> reasoning by analogy—a commonplace task for any lawyer or judge.
> Like all analogical reasoning, determining whether a historical
> regulation is a proper analogue for a distinctly modern firearm
> regulation requires a determination of whether the two regulations are
> "relevantly similar."

*Id.* at 28, 29 (citation omitted).  In order to ascertain whether regulations are

"relevantly similar," the Court notes that "*Heller* and *McDonald* point toward at

least two metrics:  how and why the regulations burden a law-abiding citizen's

right to armed self-defense."  *Id.* at 29.  The Court explains that the burden on the

Government is to identify a "well-established and representative historical

*analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead

ringer for historical precursors, it still may be analogous enough to pass

constitutional muster."  *Id.* at 30.

## B. Application to Section 922(k)

The court now turns to the instant issue of determining the constitutionality

of Section 922(k).  In support of his motion to dismiss, Brabham largely relies on

*United States v. Price*, 635 F.Supp.3d 455 (S.D.W. Va. 2022), which found that §

8

922(k) was unconstitutional because it infringed on conduct protected by the plain text of the Second Amendment, and the Government had not met its burden of showing a sufficient historical analogue.  *Price*, 635 F.Supp.3d at 457.  As required by *Bruen*, the *Price* court began with the question of whether § 922(k) prohibits conduct that is within the scope of the plain text of the Second Amendment.  *Id.* at 459.  The court found that § 922(k) is not a commercial regulation, but rather, "a blatant prohibition on possession" because it "criminalizes the mere *possession* of a firearm after a serial number is removed, obliterated, or altered in any way, whether or not the firearm is then placed into commerce."  *Id.* at 460.

The *Price* court then analyzed the historical regulations submitted by the Government.  The court noted that , after reviewing the legislative history, "the 'societal problem[s] addressed by § 922(k) appear to be crime, including crime involving stolen firearms, and assisting law enforcement in solving crime."  *Id.* at 463.  Because the court found that the purpose of § 922(k) is aiding crime-solving, it discounted many of the Government's proposed historical regulations because it considered those regulations "commercial regulations."  *Id.* at 463–64.  The *Price* court concluded: "[a] firearm without a serial number in 1791 was certainly not considered dangerous or unusual compared to other firearms because serial numbers were not required or even commonly used at the time."  *Id.* at 464.  Ultimately, the court found that "the founders addressed the 'societal problem' of

non-law-abiding citizens possessing firearms through 'materially different means' felon disarmament laws like § 922(g)(1).  Under *Bruen*, this is 'evidence that [the] modern regulation is unconstitutional.'"  *Id.* at 464 (citing *Bruen*, 597 U.S. at 26–27.)

In this case, the Government raises several arguments for why the conduct prohibited by § 922(k) is not covered by the plain text of the Second Amendment. First, the Government argues that § 922(k) is outside the scope of the Second Amendment because requiring serial numbers for firearms has no impact on one's ability to possess a firearm for self-defense.  (Doc. 66, pp. 6–10.)  Second, the Government argues that Brabham is not one of the "people" covered by the Second Amendment because Brabham was not acting as a law-abiding citizen when he possessed a firearm without a serial number.  (*Id.* at 8.)  Third and finally, the Government also argues that the Second Amendment does not cover the firearm at issue because "the weapon in question is a firearm with an obliterated serial number, which is *not* typically used by law-abiding citizens for lawful purposes." (Doc. 102, p. 23) (citing *Heller*, 554 U.S. at 625)("[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes."))

No Circuit Court has considered the constitutionality of § 922(k) post-*Bruen*; however, several district courts have.  The majority of courts have found

that § 922(k) is constitutional, for a variety of reasons.  To date, only the *Price*

court has found that § 922(k) is unconstitutional.  At the first step of the *Bruen*

analysis, some courts, such as the Northern District of Texas in *United States v.*

*Holton*, 639 F.Supp.3d 704, 710–11 (N.D. Tex 2022), have found that § 922(k)

does not "infringe on an individual's right to bear arms for self-defense" because

"[t]he Second Amendment 'is not a right to keep and carry any weapon whatsoever

in any manner whatsoever.'"  *Holton*, 639 F.Supp.3d at 710–11 (citing *Heller*, 554

U.S. at 626).  Thus, "[w]hile § 922(k) may restrict one manner in which

individuals may keep and carry firearms, this restriction does not infringe on an

individual's right to bear arms for self-defense."  *Id.*; *see also United States v. Tita*,

No. RDB-21-0334, 2022 WL 17850250, at *7 (D. Md. Dec. 22, 2022); *United*

*States v. Serrano*, 651 F.Supp.3d 1192, 1210 (S.D. Cal 2023); *United States v.*

*Bradley*, No. 2:22-CR-00098, 2023 WL 2621352, at *3 (S.D.W. Va. March 23,

2023); *United States v. Avila*, 672 F.Supp.3d 1137, 1144 (D. Colo. 2023)

(collecting cases); *United States v. Patton*, 4:21-CR-3084, 2023 WL 6230413, at

*1–2 (D. Neb. Sept. 26, 2023) (collecting cases); *United States v. Sing-Ledezma*,

No. EP-23-CR-823(1)-KC; 2023 WL 8587869, at *3 (W.D. Texas Dec. 11, 2023)

(collecting cases).

      Other courts, such as the Northern District of Indiana in *United States v.*

*Reyna*, No. 3:21-CR-41, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022), have

found that "[g]uns with obliterated serial numbers belong to 'those weapons not typically possessed by law-abiding citizens for lawful purposes' so possession of such guns isn't within the Second Amendment's scope." *Reyna*, 2022 WL 17714376 at \*5.  The *Reyna* court noted that "[g]uns with obliterated serial numbers are useful for criminal activity because identifying who possessed a firearm is more difficult when the serial number is destroyed.  By using a gun without a serial number, a criminal ensures he has a greater likelihood of evading justice." *Id.* (citing *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010)).[5]

Within this Circuit, the District Court of the Virgin Islands has found § 922(k) constitutional.  As explained by the court in *United States v. Dangleben*, 3:23-MJ-9944, 2023 WL 6441977 (D.V.I. Oct. 3, 2023),[6] "the regulated conduct at issue here is not the mere possession of any firearm but rather the possession of a firearm with a removed, obliterated, or altered serial number." *Dangleben*, 2023 WL 6441977, at \*4.  "Regulated conduct is only within the scope of the Second

---

[5] In *Marzzarella*, the Third Circuit found § 922(k) constitutional after applying means-end scrutiny.  Thus, while the holding of this case is no longer binding, much of the Third Circuit's discussion on the utility of firearms with obliterated serial numbers has been incorporated into the analysis in cases decided post-*Bruen*.

[6] The court notes that the District Court of the Virgin Islands first considered the issue in *United States v. Walter*, No.3:23-CR-0039, 2023 WL 3020321, at \* 5 (D.V.I. April 20, 2023).  However, the court finds the discussion contained in *Dangleben* more thorough and instructive, and, thus, discusses *Dangleben* here.  In *Walter*, the District Court for the Virgin Islands found that § 922(k) was constitutional because "firearms with obliterated serial numbers are not typically used by law-abiding citizens for lawful purposes." *Walter*, 2023 WL 3020321 at \*5 (citing *Reyna*, 2022 WL 17714376, *Holton*, 639 F.Supp.3d at 710–11.)

Amendment if the regulation 'infringe[s]' on 'a law-abiding citizen's right to armed self-defense.'"  *Id.* at *5.  Thus, "because a person can defend themselves just as effectively with a serialized or deserialized firearm, there is nothing about § 922(k)'s prohibition that limits an individual's right to bear arms and defend oneself in the case of confrontation."  *Id.*

This court joins the majority of district courts that have addressed this issue to date, and concludes that the conduct prohibited by § 922(k) is not within the scope of the plain text of the Second Amendment.  As noted by the *Dangleben* court, § 922(k) regulates possessing a firearm with an obliterated serial number.  *Id.* at * 4.  A firearm without a serial number is not necessary for a law-abiding citizen's right to self-defense, which is the conduct at the heart of the Second Amendment.  *Id.*; *see also Bruen*, 597 U.S. at 17 ("In *Heller* and *McDonald*, we held that the Second and Fourth Amendments protect an individual right to keep and bears arms for self-defense.")  Therefore, a law criminalizing the possession of a firearm without a serial number does not infringe on one's right to bear arms for self-defense, making § 922(k) outside the scope of the Second Amendment.  Thus, Brabham's motion to dismiss will be denied on these grounds.

But even assuming that the conduct prohibited by § 922(k) is within the scope of the Second Amendment, the court finds that the government has provided sufficient historical analogues to demonstrate a history and tradition regulating the

13

conduct that§ 922(k) regulates.  Because it is the Government's burden to show

historical analogues, the court will begin with the Government's arguments.  In its

first opposition brief, the Government argued that "[s]cholars have noted that many

of the colonies enacted laws regarding the registration of firearms as part of

legislative schemes regarding the sale, transfer, and taxation of firearms."  (Doc.

66, p. 12) (citing *Teixeira v. City of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017)).

The Government then referenced a New York statute from 1652 outlawing the

illegal trading of guns, gun powder, and lead; a 1631 Virginia law requiring the

recording of arms and munitions arriving into the colony, laws from the 1800s

from three southern states that imposed taxes on firearms, and laws from the 18th

and 19th centuries which governed "the manufacture, sale, [and] transport" of

guns.  (*Id.* at 12, 13.)

    In its second brief, the Government elaborated further on the history and

tradition in this country of regulating the sale of firearms.  First, the Government

pointed to various colonial restrictions on selling firearms, either limiting the sale

of firearms to within the colony or limiting the people to which firearms could be

sold.  (Doc. 102, pp. 24, 25.)  Next, the Government points to laws "relating to the

inspection and marking of gunpowder, which was essential to the operation of

firearms at that time, meaning that gunpowder regulations necessarily affected the

ability of gun owners to use firearms for self-defense."  (*Id.* at 25) (quotations

omitted).  The Government also points to requirements that gun barrels be marked and prohibitions on the removing of those marks.  (*Id.* at 27–29.)  The Government argues that these regulations imposed a "minimal burden" on the rights of citizens to use firearms for self-defense that is analogous to the "minimal burden" that § 922(k) places on the right to use firearms for self-defense.  (*Id.* at 30.)  Finally, the Government argues that the fact that the legislature did not regulate in the same manner as in the statute at issue has little probative value because "legislatures cannot be presumed to always legislate to the limits of their constitutional authority."  (*Id.* at 32.)

Brabham responds first, along with the reasoning of *Price*, that the societal problem to be solved by § 922(k) is crime, and the Founding Era addressed the problem of crime with firearms through disarmament.  (Doc. 51, pp. 6, 7.)  In his reply brief, Brabham further argues that laws regarding the regulation of gunpowder are not similar because they are commercial regulations, and § 922(k) is a regulation addressing crime.  (Doc. 103, pp. 11, 12.)  He further argues that the historical examples regarding "proofing" are not similar because they are more akin to consumer safety measures than the "crime-solving" purposes of § 922(k).  (*Id.* at 12, 13.)  Finally, Brabham argues that the few examples the Government gives of regulating firearms trade are outliers, representing only two or three of the

colonies or states in existence at the time, and thus, do not support a showing of a robust historical tradition of regulating firearms.  (*Id.* at 15.)

The Government has met its burden of providing relevantly similar historical analogues to § 922(k).  As noted by the *Dangleben* court, there were two purposes for enacting § 922(k): first, "control[ling] the black-market firearms trade, reduc[ing] the number of stolen firearms, and ultimately keeping such weapons out of the hands of criminals[;]" and second, "assist[ing] law enforcement in solving crimes."  *Dangleben*, 2023 WL 6441977, at * 7.  Accordingly, the court will look to how the Founding era regulated similar problems in order to find historical analogues.[7]

The Government points to *Teixeira v. County of Alameda*, which includes a thorough explanation of firearm regulations at the time of the founders, including several colonies that criminalized selling, giving, or delivering firearms to certain people, namely either Native Americans or those who were not subjects of the colony.  (Doc. 66, pp. 11, 12) (citing *Teixeira*, 873 F.3d at 685.)  The Government also notes several early colonial laws that "outlawed illegal trading," required registration or imposed taxes on firearms.  (*Id.* at 12.)  Additionally, the Government notes laws regarding the inspection and testing of firearms in the 18th

---

[7] The court limits its review of historical analogues to those provided by the Government because the Government bears the burden and the Government's cited historical sources have been subjected to adversarial scrutiny in this case.

and 19th centuries.  (*Id.* at 13; Doc. 102, pp. 25–29.)  These regulations operated to control who could possess firearms and show the beginnings of legislative efforts to track firearms, which operate to achieve the same purposes as § 922(k).  *See Dangleben*, 2023 WL 6441977, at *9; *Bradley*, 2023 WL 2621352, at *5.

Accordingly, the Government has met its burden of showing a history and tradition that is analogous with § 922(k), and thus, § 922(k) is constitutional. Brabham's motion will be denied on this ground as well.

Finally, Brabham asserts that § 922(k) is unconstitutional under the Commerce Clause.  (Doc. 51, pp. 8.)  After citing general law regarding the Commerce Clause, the totality of Brabham's argument is as follows: "[t]he common construction of § 922(k) and similar laws reaches a broad swath of non-commercial activity that has no connection at all to any of these authorized areas of regulation."  (*Id.*)  Notwithstanding that Brabham does not develop this argument by citing any supporting authority, this argument is foreclosed by Third Circuit precedent and the text of § 922(k).  The Third Circuit held that § 922(g) did not violate the Commerce Clause where there was proof that, at some point in time, the gun had traveled in interstate commerce.  *United States v. Singletary*, 268 F.3d 196, 205 (3d Cir. 2001); *see also United States v. Holton*, 639 F.Supp.3d 704, 712–

12 (N.D. Tex 2022).[8]  Section 922(k) requires that the firearm at issue has been transported, shipped, or received in interstate or foreign commerce, thus meeting the requirements of the Commerce Clause.  Accordingly, this argument is rejected, and the court will deny Brabham's motion to dismiss.

## CONCLUSION

Section 922(k) is constitutional under the Second Amendment because it does not prohibit conduct that is within the scope of the Second Amendment.  Even if it did regulate conduct within the scope of the Second Amendment, the Government has provided sufficient historical analogues to show a history and tradition of regulating the conduct that § 922(k) regulations.  Accordingly, Brabham's motion to dismiss will be denied.  An order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: June 24, 2024

---

[8] The court in *Holton* dismissed the Commerce Clause argument based on Fifth Circuit precedent, *United States v. Wallace*, 889 F.2d 580, 583 (5th Cir. 1989), that held that the terms "affecting commerce" in § 922(g) are "jurisdictional words of art" which Congress uses to "signal[ ] its intent to exercise its Commerce Clause power broadly, perhaps as far as the Constitution permits."  *Wallace*, 889 F.2d at 583.  This standard is in accord with the standard set by the Third Circuit in *Singletary*.  *See Singletary*, 268 F.3d at 204.